# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **LISA M. GIBSON,** | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | Civil Action No. 2:15cv00016 |
| | ) | **MEMORANDUM OPINION** |
| **NANCY A. BERRYHILL,**[1] | ) | |
| **Acting Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Lisa M. Gibson, ("Gibson"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

Case 2:15-cv-00016-PMS   Document 15   Filed 03/17/17   Page 1 of 28   Pageid#: 985

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Gibson filed a previous application for SSI on June 30, 2008, which was denied initially and on reconsideration. (R. at 64.) Thereafter, by decision dated November 2, 2010, an ALJ denied Gibson's claim. (R. at 64-75.) The Appeals Council denied Gibson's request for review, and Gibson appealed the ALJ's unfavorable decision to this court. (R. at 89-93.) By Judgment dated December 20, 2013, this court affirmed the ALJ's unfavorable decision. *See Gibson v. Colvin*, Case No. 2:12cv00026. (Docket Item No. 18.) Therefore, res judicata attached to the prior decision. Gibson protectively filed her current application for SSI on November 13, 2010, alleging disability as of November 3, 2010, due to chronic obstructive pulmonary disease, ("COPD"); pain in the legs, arms and back; carpal tunnel syndrome; degenerative disc disease; seizures; urine problems; depression; nerves; and bipolar disorder; dizziness; numbness; and cramps. (Record, ("R."), at 193-96, 217, 221, 238.) The claim was denied initially and on reconsideration. (R. at 112-14, 118-20, 123-24, 126-28, 130-32.) Gibson then requested a hearing before an administrative law judge, ("ALJ"). (R. at 133-34.) A hearing was held on October 29, 2013, at which Gibson was represented by counsel. (R. at 41-60.)

By decision dated November 26, 2013, the ALJ denied Gibson's claim. (R. at 21-34.) The ALJ found that Gibson had not engaged in substantial gainful

activity since November 3, 2010, the alleged onset date.[2] (R. at 23.) The ALJ determined that the medical evidence established that Gibson suffered from severe impairments, namely degenerative disc disease and/or changes in the lumbar spine and cervical spine; emphysema/COPD; hepatitis – liver problems; affective disorders; anxiety-related disorders; possible seizure disorder; and a history of polysubstance abuse (alcohol and drugs). (R. at 23-24.) The ALJ also found that, in 2013, the claimant was diagnosed with cirrhosis and hepatic failure. (R. at 24.) The ALJ found that, since November 3, 2010, Gibson had not had an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24-28.) The ALJ found that, prior to March 28, 2013, Gibson had the residual functional capacity to perform simple, repetitive, unskilled light work,[3] that did not require more than six hours of standing, sitting and/or walking in an eight-hour workday; that did not require more than occasional balancing, kneeling, crouching, crawling or climbing of ramps or stairs and interacting with co-workers and supervisors; that did not require concentrated exposure to temperature extremes, excess humidity, pollutants and irritants; that required no exposure to hazards, climbing of ladders, ropes or scaffolds, working on vibrating surfaces or interacting with the public; and that did not require driving tasks. (R. at 28.) The ALJ also found that Gibson could respond appropriately to supervision, co-workers and usual work situations. (R. at 28.) The ALJ found that, beginning on March 28, 2013, Gibson had the residual functional

---

[2] Therefore, Gibson had to show that she was disabled between November 3, 2010, the alleged onset date, and November 26, 2013, the date of the ALJ's decision, in order to be eligible for SSI benefits.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2016).

capacity to perform simple, repetitive, unskilled sedentary work[4] that did not require standing and/or walking more than two hours in an eight-hour workday or sitting more than six hours in an eight-hour workday; that required no more than occasional balancing, kneeling, crouching, crawling, or climbing of ramps or stairs; that did not require concentrated exposure to temperature extremes, excess humidity, pollutants and irritants; that did not require any exposure to hazards, ladders, ropes or scaffolds or working on vibrating surfaces; and that did not require the performance of driving tasks. (R. at 32.) The ALJ also found that Gibson could not interact with the public and could only occasionally interact with co-workers and supervisors, but that she could respond appropriately to supervision, co-workers and usual work settings. (R. at 32.) The ALJ found that, since November 3, 2010, Gibson was unable to perform any past relevant work. (R. at 32.) The ALJ further found that, prior to March 28, 2013, Gibson was a "younger person," but since March 28, 2013,[5] Gibson's age category changed to a "person closely approaching advanced age." (R. at 32.) The ALJ found that, prior to March 28, 2013, considering Gibson's age, education, work history and residual functional capacity and the testimony of a vocational expert, jobs existed in significant numbers in the national economy that Gibson could have performed, including jobs as a production worker, a packing line worker and a production helper. (R. at 33.) Thus, the ALJ found that, prior to March 28, 2013, Gibson was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 34.) *See* 20 C.F.R. § 416.920(g) (2016). The ALJ found that, beginning on

---

[4] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing are often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 416.967(a) (2016).

[5] The undersigned notes that Gibson did not attain 50 years of age until September 29, 2013. (R. at 44, 193.)

March 28, 2013, considering Gibson's age, education, work history and residual functional capacity and the testimony of a vocational expert, there were no jobs existing in significant numbers in the national economy that Gibson could perform. (R. at 34.) *See* 20 C.F.R. §§ 416.960(c), 416.966 (2016). More specifically, the ALJ found that, beginning on March 28, 2013, even if Gibson had the residual functional capacity for the full range of sedentary work, a finding of disabled was directed by the Medical-Vocational Guidelines, ("the Grids"), found at 20 C.F.R. Part 404, Subpart P, Appendix 2. (R. at 34.) Therefore, the ALJ found that Gibson was not disabled prior to March 28, 2013, but became disabled on that date and continued to be disabled through the date of the decision. (R. at 34.)

After the ALJ issued her partially favorable decision, Gibson pursued her administrative appeals, (R. at 10-12), and the Appeals Council granted her request for review. (R. at 1-8.) By order dated June 19, 2015, the Appeals Council found that, as of September 28, 2013, when Gibson turned 50 years old,[6] she became a "person closely approaching advanced age," at which time the Grids directed a finding of disabled. (R. at 6.) Gibson then filed this action seeking review of the Appeals Council's partially favorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2016). The case is before this court on Gibson's motion for summary judgment filed April 25, 2016, and on the Commissioner's motion for summary judgment filed May 31, 2016.

---

[6] As previously noted, Gibson did not attain 50 years of age until September 29, 2013. (R. at 44, 193.)

## II. Facts[7]

Gibson was born in 1963, (R. at 44, 193), which, at the time of the alleged onset date, classified her as a "younger person" under 20 C.F.R. § 416.963(c), but at the time of the ALJ's decision, classified her as a "person closely approaching advanced age" under 20 C.F.R. § 416.963(d). Gibson obtained a General Equivalency Development, ("GED"), diploma and has six months of college instruction. (R. at 56, 222.) She has past work experience as a cashier, a cook, a prep cook and an owner of a country grocery store. (R. at 222.) She testified that she had a history of seizures and had been experiencing concentration and memory difficulty since having a seizure in June 2013, for which she was hospitalized. (R. at 47-48, 51.) She stated that, at the time of that hospitalization, she had a diagnosis of cirrhosis and had some swelling of the feet, legs and stomach. (R. at 48.) Gibson testified that she had not consumed alcohol since June 2013. (R. at 48.) She testified that, since the June 2013 seizure, she could no longer work. (R. at 51.) Gibson also testified that she could get around better prior to this seizure, noting that she was no longer able to go to the grocery store because she got "dizzy headed." (R. at 52.) She testified that she had not driven in 10 or 15 years due to the seizures. (R. at 52.)

Gibson testified that she suffered from depression and anxiety, which had worsened over the years. (R. at 54-55.) She reported crying spells and panic attacks. (R. at 55.) However, Gibson testified that she was not receiving any treatment for her mental impairments at the time of the hearing. (R. at 50.) She stated that she had seen a counselor in the past, but he canceled her appointment

---

[7] Gibson's arguments on appeal are based solely on her mental health impairments. Therefore, the court will largely limit its discussion to the medical evidence relevant to Gibson's mental health during the relevant time period. To the extent that other evidence is included herein, it is for clarification purposes.

-6-

approximately a month prior to the hearing, and she had not heard back from him. (R. at 50.) She stated that she was not sure why she was seeing him. (R. at 50.) Gibson testified that she was psychiatrically hospitalized in 2008 after finding some drugs along the side of the road, which she took with alcohol. (R. at 50-51.)

Asheley Wells, a vocational expert, also was present and testified at Gibson's hearing. (R. at 56-59.) Wells classified Gibson's past work experience as a fast food worker as medium[8] and unskilled, as performed; as a salad counter attendant as medium and semi-skilled, as performed; as a cashier at a grocery store as light and unskilled; and as an owner of a small market as light and skilled. (R. at 56-57.) Wells was asked to consider a hypothetical individual "such as the claimant,"[9] who had the residual functional capacity to perform only simple, repetitive, unskilled light work, with some postural and environmental limitations, and which required no interactions with the general public and no more than occasional interaction with co-workers and supervisors. (R. at 57.) This individual could respond appropriately to supervision, co-workers and usual work situations. (R. at 57.) Wells testified that such an individual could not perform any of Gibson's past relevant work, either as she performed it or as it customarily is performed in the national economy. (R. at 57.) Next, Wells was asked to consider the same hypothetical individual who was a "younger person" at the alleged onset date of disability, but who became a "person closely approaching advanced age," with Gibson's education and past work experience. (R. at 57-58.) Wells testified

---

[8] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 416.967(c) (2016).

[9] The ALJ did not specify whether this individual was a "younger person" or a "person closely approaching advanced age." She did state, however, that the hypothetical question "was for a period of time before it appears from the record that the claimant's situation deteriorated considerably." (R. at 57.)

that such an individual could perform the jobs of a production worker, a packing line worker and a production worker, such as a garment folder. (R. at 58.) Wells was asked to consider the same hypothetical individual, but who had some more limiting postural limitations, and who would have substantial problems with even simple work due to memory difficulties. (R. at 58.) Wells testified that such an individual could not perform any of Gibson's past relevant work, nor could she perform any other work existing in significant numbers in the national economy. (R. at 58-59.) Wells testified that Gibson's skilled and semi-skilled work would not have generated skills that could be transferred to skilled or semi-skilled work within the parameters of this third hypothetical. (R. at 59.)

In rendering her decision, the ALJ reviewed records from Bon Secours St. Mary's Hospital; Wise County Health Department; Ridgeview at Bristol Regional Medical Center; Lonesome Pine Hospital; Wise County Behavioral Health Services; Stone Mountain Health Services; Norton Community Hospital; University of Virginia Health Systems; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Southwest Surgical Clinic; Dr. Kevin Blackwell, D.O.; Remote Area Medical Clinic; Dr. L. D'Amato, M.D.; Community Clinic; Frontier Health Assessment & Forensic Services; Indian Path Medical Center; Health Wagon; Holston Medical Group; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Joseph Duckwall, M.D., a state agency physician; Eugenie Hamilton, Ph.D. a state agency psychologist; and Dr. Robert McGuffin, M.D., a state agency physician.

By way of background, the court notes that Gibson was hospitalized at Ridgeview at Wellmont Bristol Regional Medical Center on a temporary detention order on April 12, 2008, after overdosing on 12 beers, two shots of liquor, Valium

and Xanax. (R. at 275-303, 619-20.) She denied suicidal thoughts on admission, and she denied all past psychiatric history, including medications, counseling and hospitalizations. (R. at 279.) On admission, she was moderately depressed and moderately anxious with a blunted affect. (R. at 280.) Gibson was discharged on April 14, 2008, with diagnoses of depression, not otherwise specified; adjustment disorder; and a Global Assessment of Functioning, ("GAF"),[10] score of 60.[11] (R. at 275.) At the time of discharge, Gibson's affect was a little bit brighter, she was fully oriented, recent and remote memory appeared intact, she denied auditory or visual hallucinations or delusions, she denied suicidal or homicidal ideation, and her judgment and insight were fair. (R. at 276.) She was not prescribed any medications, but was advised to follow up with Wise County Behavioral Health Services, ("WCBHS"). (R. at 275.)

Gibson was seen at WCBHS from February 14, 2006, through March 12, 2009, during which time she successfully completed Virginia Alcohol Safety Action Program, ("VASAP"), sessions after receiving a charge of driving under the influence. (R. at 323-80.) Over this time, she had a euthymic mood with congruent affect. (R. at 353-65, 367-78.) She did not have any overt signs of substance abuse. (R. at 353-65, 367-78.) On July 21, 2008, Gibson was seen for a Crisis Intervention/Consultation. (R. at 614-15.) She reported being depressed and attempting to obtain disability benefits. (R. at 614.) A history of substance abuse/dependence was noted. (R. at 615.) Gibson was diagnosed with depressive

---

[10] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[11] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

disorder, not elsewhere classified, and her GAF score was assessed at 50.[12]  (R. at 615.)  From August 8, 2008, through December 16, 2009, Gibson saw James Kegley, MS, sporadically, for mental health counseling to address complaints of depression and anxiety.  (R. at 326-51, 649-95.)  Over this time, she reported depression due to multiple life stressors, including being unemployed and seeking disability benefits, physical health complaints, financial and transportation difficulties and difficulty with a long-term relationship that had ended in 2000.  (R. at 329, 650, 659, 671, 673, 681, 688, 692.)  Kegley stated that Gibson was able to complete all activities of daily living and independent living with no intervention.  (R. at 331.)  Gibson reported no substance abuse issues.  (R. at 333.)  She was diagnosed with major depressive disorder; anxiety disorder, not otherwise specified; nicotine dependence; and a GAF score of 50, with 50 being her highest and lowest scores in the previous six months.  (R. at 339.)  Over this time, her mood was mildly depressed with congruent affect, with the exception of one occasion in August 2009, when her mood ranged from moderately to severely depressed, and one occasion in September 2009, when it was mildly to moderately depressed.  (R. at 649-50, 657, 659, 671, 673, 681, 688, 691-93.)  On November 5, 2009, Gibson stated that she had a new partner, and they had "a ball together," going places together and planning to celebrate Thanksgiving together.  (R. at 650.)  Gibson was dressed and groomed better than at times in the past.  (R. at 650.)  Kegley noted that her new relationship appeared to lessen some of Gibson's daily stress.  (R. at 650.)  On December 16, 2009, WCBHS received a call from Norton Community stating that she was admitted the previous day with a blood

---

[12] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …"  DSM-IV at 32.

alcohol level of .487.[13]  (R. at 648.)  Gibson had stated that she was "just partying and drank too much."  (R. at 648.)  Gibson also reported drinking every day.  (R. at 648.)  Gibson was discharged by Kegley on February 17, 2010, after she failed to make contact with him after numerous attempts.  (R. at 621, 644.)

On July 20, 2010, Gibson saw C. Looney, a family nurse practitioner, at Stone Mountain Health Services, ("Stone Mountain"), for a general physical in order to file a disability claim.  (R. at 553-55.)  Gibson did not note any psychiatric difficulties, and Looney noted no abnormalities with orientation, memory, mood and affect or insight and judgment.  (R. at 553-54.)  She was prescribed Celexa for depression and anxiety.  (R. at 555.)

Gibson returned to counseling with Kegley in July 2010. (R. at 641.)  In an intake assessment, dated July 2, 2010, she reported that her mother's death in 2005 and the loss of her family business in 2006 caused much of her anxiety and depression. (R. at 616-18.) She denied any suicidal or homicidal ideations, as well as auditory or visual hallucinations. (R. at 617.) She was provisionally diagnosed with major depressive disorder, single episode; anxiety state, unspecified; and nondependent tobacco use disorder. (R. at 617.) Her then-current GAF score was assessed at 60, with the highest being 65[14] and the lowest being 50 in the previous six months. (R. at 617.) She was noted to be depressed and anxious with sleep disturbance and a history of substance abuse/dependence. (R. at 617-18.)  It further was noted that there had been a marked reduction in Gibson's psychiatric, adaptive

---

[13] The court notes that this blood alcohol level would be fatal in most people. However, this level might be possible in a person, such as Gibson, who suffered from a long-standing alcohol abuse problem.

[14] A GAF score of 61-70 indicates "[s]ome mild symptoms … OR some difficulty in social, occupational, or school functioning …, but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 32.

-11-

or behavioral functioning or an extreme increase in personal distress, as supported by Gibson's reports that her depression and anxiety had increased in the previous six months due to increased life stressors, physical health problems and financial problems. (R. at 618.) Gibson continued to see Kegley through August 27, 2010. (R. at 575-83, 591-603, 605-07, 638-39.) On July 30, 2010, his diagnoses of Gibson remained unchanged, but he placed her GAF score at 50. (R. at 595.) However, Kegley noted that Gibson was able to complete all activities of daily living and independent living with no intervention. (R. at 580.) She reported depression and anxiety due to her various past and current life issues. (R. at 580.) Gibson reported occasional use of alcohol. (R. at 582.) In August 2010, she reported having panic attacks once or twice weekly, but stated she did not know what caused them. (R. at 639.) Gibson was mildly depressed with congruent affect. (R. at 639.) She reported going to the library once or twice weekly for diversion/leisure. (R. at 639.) On August 27, 2010, she reported that her nerves were "always bad," and she wished she was able to work. (R. at 638.) Gibson reported continued daily panic attacks, and she stated that her anxiety was such that she did not want to be near anyone. (R. at 638.) Her mood was mildly depressed with congruent affect. (R. at 638.)

On September 29, 2010, in connection with her previous SSI application, Gibson saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, for a psychological evaluation at the request of her counsel. (R. at 560-71.) Gibson reported attending counseling and that she had just begun taking Celexa. (R. at 564.) She had a flat affect, and her mood was described as an agitated depression. (R. at 565.) She reported crying daily with a progressively worsening short-term memory. (R. at 565.) Gibson reported concentration difficulties and mind wandering with distractibility. (R. at 565.) She reported having panic attacks for

-12-

several years. (R. at 565.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, on which Gibson achieved a full-scale IQ score of 62, placing her in the extremely low range of intellectual functioning. (R. at 566.)[15] The Minnesota Multiphasic Personality Inventory – Second Edition, ("MMPI-2"), also was administered, the results of which indicated that Gibson might have responded in a random or unselected manner to items toward the end of the test. (R. at 567-68.) Therefore, her profile had to be interpreted with clinical caution due to the validity scales. (R. at 568.)

Lanthorn diagnosed Gibson with major depressive disorder, recurrent, severe; pain disorder associated with both psychological factors and general medical conditions, chronic; anxiety disorder with both panic attacks and generalized anxiety disorder due to chronic physical problems, pain and limitations; mild mental retardation; and rule out personality disorder. (R. at 569-70.) He placed her then-current GAF score at 50. (R. at 570.) Lanthorn opined that Gibson was able to manage her own funds, and he deemed her psychological prognosis guarded. (R. at 570.) He found that Gibson was functioning in the mild mentally retarded range. (R. at 570.) He concluded that Gibson was severely depressed with frequent panic attacks and ongoing generalized anxiety, but that she had intact communication skills and was capable of exercising appropriate self-care. (R. at 570-71.) Lanthorn concluded that Gibson had severe psychological limitations with regard to functioning in gainful employment at that time. (R. at 571.)

---

[15] While Lanthorn's intelligence testing placed Gibson in the extremely low intelligence range, there is no evidence that she tested in this range prior to age 22. Also, her counsel does not argue that she met the listed impairment for intellectual disability found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.

-13-

Lanthorn also completed a mental assessment, indicating that Gibson had either a seriously limited or no useful ability in all areas of making occupational, performance and personal/social adjustments. (R. at 572-74.) He noted that his diagnoses of Gibson supported this mental assessment. (R. at 572.) Lanthorn opined that Gibson could manage benefits in her own best interest and that she would be absent from work more than two days monthly due to her impairments or treatment. (R. at 574.)

On March 10, 2011, Kegley completed a DSM IV Assessment, finding that Gibson suffered from major depressive disorder, single episode; anxiety disorder, not otherwise specified; and nicotine dependence, and he placed her then-current GAF score at 55. (R. at 799-800.)

On July 7, 2011, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), in connection with Gibson's initial disability claim. (R. at 84-85.) However, because Gibson had failed to respond to efforts to obtain recent sources and updated function reports, Leizer concluded that there was insufficient evidence to evaluate the severity of her mental impairments. (R. at 85.)

Gibson returned to Kegley on July 3, 2012. (R. at 796.) She reported continued depression, as well as daily panic attacks, stating that she was "terrified to be around people." (R. at 796.) Kegley provisionally diagnosed Gibson with major depressive disorder, single episode, moderate; anxiety state, unspecified; and tobacco use disorder, and he assessed her then-current GAF score at 50. (R. at 796.) Although Kegley reported that there had been a marked reduction in Gibson's psychiatric, adaptive or behavioral functioning or an extreme increase in

-14-

personal distress, his only "explanation" was that Gibson denied any past or current suicidal or homicidal ideations. (R. at 796.) On September 21, 2012, she reported that her depression was bad, partially caused by "all this waiting" on her disability. (R. at 771-87.) She complained of insomnia, lack of appetite and irritability with mood swings and tearfulness, but she denied any audiovisual hallucinations. (R. at 771.) It was noted that Gibson previously had received outpatient counseling services, but her case was closed due to lack of transportation and lack of finances. (R. at 771.) Gibson reported that she had been with her partner for three years. (R. at 771.) She reported only watching television for diversion. (R. at 775.) Kegley found that Gibson had age-appropriate activities of daily living skills. (R. at 776.) She denied current substance abuse, but reported smoking a pack of cigarettes daily. (R. at 777-78.) She stated that she relied on the Mountain Empire Older Citizens, ("MEOC"), van for transportation. (R. at 778.) Kegley's diagnoses of Gibson remained unchanged, and he placed her then-current GAF score at 50. (R. at 780.)

Gibson saw Dr. Kevin Blackwell, D.O., on July 29, 2012, for a medical evaluation at the request of Disability Determination Services. (R. at 709-12.) At that time, she was in no acute distress, she was alert, cooperative and fully oriented with good mental status. (R. at 710.) Her affect, thought content and general fund of knowledge appeared intact. (R. at 710.) In addition to several physical impairments, Dr. Blackwell diagnosed depression. (R. at 711.)

On August 23, 2012, when Gibson was seen in the emergency department at Norton Community Hospital after suffering a possible seizure, she voiced no psychological complaints. (R. at 766-67, 906.) More specifically, she denied the

-15-

presence of any significant mood disorders, anxiety or depression.  (R. at 910.) She denied alcohol use and substance abuse at that time, as well.  (R. at 766.)

On October 1, 2012, Eugenie Hamilton, Ph.D., a state agency psychologist, completed a PRTF in conjunction with the reconsideration of Gibson's disability claim. (R. at 101.)  Hamilton found that Gibson had no restrictions on her activities of daily living, moderate difficulties maintaining social functioning, no difficulties maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration. (R. at 101.) Hamilton concluded that Gibson's ability to function in public may be her only significant limitation to her mental status. (R. at 101.) Hamilton also completed a mental residual functional capacity assessment of Gibson, finding that she was moderately limited in her ability to interact with the general public and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (R. at 104-05.) She concluded that Gibson was capable of at least simple, unskilled tasks that did not require a great deal of contact with others.  (R. at 105.)

On February 26, 2013, Gibson saw Dr. Jody Bentley, D.O., at the Community Clinic at Norton Community Hospital to establish new patient status. (R. at 843-45.) At that time, she did not complain of any mental impairment, and it was noted that she was fully oriented with a normal affect and intact insight and judgment. (R. at 844.)

Gibson returned to Kegley on March 19, 2013, reporting that she had suffered another seizure and continued to have transportation and financial issues. (R. at 812-13.)  She stated that she did not know how to explain her depression, but she reported that it had worsened. (R. at 812.) She said she had no desire to do

-16-

anything and had little appetite. (R. at 812.) Gibson's mood ranged from mildly to moderately depressed with congruent affect. (R. at 812.)

When Gibson was hospitalized at Indian Path Medical Center, ("Indian Path"), from June 21, 2013, through July 1, 2013, for complaints of acute seizure, she denied any depression, suicidal or homicidal ideations, anxiety or hallucinations. (R. at 815-34, 865-83.) Her psychiatric state was deemed normal at that time. (R. at 871.)

Gibson returned to Dr. Bentley on July 25, 2013, for a follow-up appointment following her hospitalization. (R. at 836-39.) At that time, she was fully oriented, had intact insight and judgment and had a normal affect with unimpaired recent memory. (R. at 837.)

Gibson again saw Lanthorn on October 1, 2013, at the referral of her counsel, for another psychological evaluation. (R. at 890-98.) She was fully oriented. (R. at 891.) She denied alcohol use, but reported a history of the same with three DUI convictions. (R. at 892.) Lanthorn noted that Gibson was then-currently receiving counseling from Kegley, who had diagnosed her with major depressive disorder, single episode, moderate; anxiety disorder; and nicotine dependence. (R. at 893.) Gibson described her day as getting up and laying on the couch, receiving visits from a friend occasionally, doing her own laundry, cooking and cleaning and watching television. (R. at 893.) She stated that a friend did her grocery shopping. (R. at 893.) On mental status examination, Gibson's speech was clear and intelligible, but she made many requests for repetition of various questions. (R. at 893.) Her affect was generally blunt and flat, and her mood was dysthymic. (R. at 893.) She exhibited no clinical signs or indications of ongoing

psychotic processes, delusional thinking or hallucinations. (R. at 893.) Gibson displayed no evidence of a thought disorder, and her thinking was lucid. (R. at 893.) She rated her depression a 10 on a 10-point scale. (R. at 894.) Gibson denied then-current suicidal or homicidal ideations, plans or intent. (R. at 894.) She indicated crying quite frequently and experiencing memory problems and concentration difficulties much of the time. (R. at 894.) She was not then-currently taking any prescription medications for depression. (R. at 894.) Gibson reported panic attacks, during which she felt like she was having a heart attack, became frightened, was very shaky and dizzy and felt as though she was smothering. (R. at 894.) After 10 minutes, Gibson could recall only one of five words presented to her earlier, and she could not perform either Serial 7s or 3s. (R. at 894.) Gibson was unable to give any interpretations to three commonly used adages presented to her, nor could she spell "world" forwards or backwards. (R. at 894.) She made erratic to poor eye contact. (R. at 894.)

Lanthorn administered the WAIS-IV, on which Gibson achieved a full-scale IQ score of 55, placing her in the extremely low range of current intellectual functioning. (R. at 895.) The MMPI-2 also was administered, which yielded invalid results because, on 74 of the testing items, she filled in both the "true" and "false" circles. (R. at 895.) Lanthorn diagnosed pain disorder associated with both psychological factors and general medical conditions, chronic; mood disorder with depressive features due to chronic physical problems and pain; anxiety disorder with both panic attacks and generalized anxiety disorder due to problems in the above listed diagnosis; rule out alcohol abuse and/or sedative, hypnotics and anxiolytic abuse; mild mental retardation; and personality disorder, not otherwise specified. (R. at 896.) He assessed Gibson's then-current GAF score at 50. (R. at 896.) Lanthorn opined that Gibson was competent to manage her own funds. (R. at

896.) He reported that the results of the psychological evaluation indicated that Gibson was not functioning as well as she was in 2010, noting that her IQ score dropped some seven points across time. (R. at 896.) He also noted that she appeared to have a hard time focusing her energies and concentration during the testing. (R. at 896-97.)

Lanthorn also completed a mental assessment of Gibson on October 17, 2013, finding that she had a seriously limited ability to follow work rules; to relate to co-workers; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 899-901.) He found that she had no useful ability to deal with the public; to use judgment; to deal with work stresses; to understand, remember and carry out both detailed and complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 899-900.) Lanthorn stated that his psychological evaluation of Gibson supported these limitations. (R. at 901.) He opined that Gibson could manage benefits in her own best interest and that she would miss more than two workdays monthly due to her impairments or treatment. (R. at 901.)

On October 3, 2013, Gibson saw Elizabeth A. Jones, M.A., a licensed senior psychological examiner, and Diane L. Whitehead, Ph.D., a licensed clinical psychologist, for a psychological evaluation at the request of Disability Determination Services. (R at 802-06.) Her affect was moderately blunted with congruent mood, and she was tearful on occasion. (R. at 802.) Although she was cooperative, the examiners noted that it was unclear whether she put forth her best effort on mental status tasks. (R. at 802.) They further noted that it was somewhat

unclear as to her alcohol use, both past and present, as Gibson stated on numerous occasions that she could not remember when she last used alcohol. (R. at 802-03.) Although she stated that she had "bad depression," she was not taking any psychotropic medications at that time. (R. at 803.) In fact, Gibson could not recall when she was last prescribed psychotropic medications. (R. at 803.) She reported that she had seen Kegley for counseling for depression for a few years, and she reported being psychiatrically hospitalized at Ridgeview after mixing alcohol with pills. (R. at 803.) She denied current thoughts of self-harm. (R. at 803.) Gibson reported significant memory problems and difficulty with recall during the evaluation. (R. at 804.) She reported crying a lot and staying to herself, low energy level and anxiety attacks. (R. at 804.) Eye contact was moderate. (R. at 804.) She had no significant difficulty with attention or concentration and responded to inquiry without repetition. (R. at 804.) Mild psychomotor retardation was noted. (R. at 804.) Gibson denied both hallucinations and delusions, and there was no evidence or presentation of any disordered thought processes. (R. at 804.) Stream of conversation was appropriate. (R. at 804.) She was both rational and alert. (R. at 804.) Gibson was able to recall two of five items immediately and three of five items after approximately 20 minutes. (R. at 804.) Jones and Whitehead opined that Gibson was functioning in the low average range of intelligence. (R. at 804.) They noted that Gibson had no significant difficulty relating to them and should have no difficulty relating to others. (R. at 805.) They opined that, due to the questionability of Gibson's current alcohol use, she may need assistance in managing her finances effectively. (R. at 805.) Jones and Whitehead diagnosed major depressive disorder, recurrent, moderate, and they placed her then-current GAF score at 60. (R. at 805.)

Jones and Whitehead also completed a mental assessment, finding that Gibson had mild[16] limitations in her ability to understand, remember and carry out simple instructions; to make judgments on simple work-related decisions; and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 807-09.) They opined that she was moderately[17] limited in her ability to understand, remember and carry out complex instructions; to make judgments on complex work-related decisions; to interact appropriately with the public; to interact appropriately with supervisors; and to interact appropriately with co-workers. (R. at 807-08.) They based these findings on Gibson's estimated low average intelligence and moderate depression. (R. at 807-08.) They opined that no other capabilities were affected by her impairments, but they found that she could not manage benefits in her own best interest. (R. at 808-09.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2016); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2016).

---

[16] A mild limitation is defined on the assessment as a slight limitation, but the individual can generally function well. (R. at 807.)

[17] A moderate limitation is defined on the assessment as more than a slight limitation, but the individual is still able to function satisfactorily. (R. at 807.)

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Gibson's argument on appeal is a very narrow one. She argues that the ALJ erred by improperly determining her residual functional capacity prior to March 28, 2013. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) More specifically, she argues that, based on the opinions of Lanthorn and the treatment notes from WCBHS, she was unable to perform any substantial gainful activity at any level of exertion and was totally disabled prior to March 28, 2013. (Plaintiff's Brief at 5-7.)

I first note that Plaintiff's argument is misplaced as it relates to the timeframe of her finding of disability. While Gibson argues that substantial evidence does not support the ALJ's finding that she was not disabled prior to March 28, 2013, the Appeals Council rejected this part of the ALJ's decision, instead finding that she did not become disabled until she turned 50 years old and became a "person closely approaching advanced age." (R. at 1-8.) Gibson's arguments on appeal should be directed to the findings contained in the Appeals

Council's June 19, 2015, Order. (R. at 5-8.) That being the case, the issue on appeal should be whether Gibson became disabled prior to September 29, 2013.[18]

The Appeals Council found that, prior to March 28, 2013, Gibson had the residual functional capacity to perform a reduced range of light work and, beginning March 28, 2013, she had the residual functional capacity to perform a reduced range of sedentary work. (R. at 6.) However, the Appeals Council found, prior to September 29, 2013, and after the alleged onset date of November 3, 2010, Gibson was a "younger person" with a high school education and a history of work with no transferrable job skills. (R. at 6.) The Appeals Council further found that the vocational expert testified that given Gibson's age, education and work experience from November 3, 2010, to September 28, 2013, she could perform the jobs of a production worker, a packing line worker and a production helper. (R. at 6.) Thus, the Appeals Council concluded that, before Gibson turned 50, there were jobs available in the national economy that she could perform and, therefore, was not disabled. (R. at 6.) The Appeals Council also found, however, that once Gibson turned 50, the Grids directed a finding of disabled. (R. at 6.)

I find that substantial evidence supports this finding. Based on the vocational expert's testimony, a hypothetical individual who was a "younger person" with Gibson's education and past work experience, and who had the residual functional capacity to perform only simple, repetitive, unskilled light work with some specified postural and environmental limitations, and which required no interactions with the general public and no more than occasional interaction with co-workers and supervisors, could perform the jobs of a production worker, a

---

[18] As stated herein, although the Appeals Council reported that Gibson turned 50 on September 28, 2013, the record demonstrates that she did so on September 29. Therefore, references to when Gibson attained 50 years of age hereinafter will be September 29, 2013.

packing line worker and a production helper. (R. at 58.)  I find that, because this hypothetical to the vocational expert encompasses all of Gibson's well-supported and documented limitations, substantial evidence also supports the Appeals Council's finding that Gibson was not disabled until she attained the status of a "person closely approaching advanced age."  At that time, Rule 201.14 directs that, a person closely approaching advanced age who has at least a high school education that does not provide for direct entry into skilled work, and whose previous work was skilled or semiskilled, but not transferrable to other work, is disabled.  For the reasons that follow, I find that substantial evidence supports the Appeals Council's finding that other work existed in significant numbers in the national economy that Gibson could perform prior to her becoming a "person closely approaching advanced age."

As stated above, Gibson argues only that, based on Lanthorn's opinions, which he claims are supported by Kegley's treatment notes, he should have been found to be disabled prior to March 28, 2013. However, given the Appeal's Council's Order, the court will address whether she should have been found to be disabled based on her mental impairments prior to September 29, 2013.  I first note that the psychological evaluation performed by Lanthorn in September 2010 was considered in connection with Gibson's prior SSI claim, and it is not relevant to the time period currently before the court. This prior time period for disability is res judicata. While Lanthorn's other psychological evaluation of Gibson, conducted on October 1, 2013, is relevant to the time period before the court, I find that the ALJ's decision to give it weight only to the extent that it is consistent with the totality of the evidence in the record is supported by substantial evidence.  More specifically, Lanthorn concluded that Gibson's psychological functioning had declined from the September 2010 evaluation. He administered psychological

-24-

testing, which revealed a full-scale IQ score of 55, placing her in the extremely low range of intellectual functioning. (R. at 894-95.) However, Lanthorn noted that she was only "marginally participative" during the test, and she would be unable to complete any questions that were abstract or complicated in any way. (R. at 894.) Additionally, Lanthorn administered the MMPI-2, but the results were invalid, because Gibson filled in both the "true" and "false" circles on 74 of the testing items. (R. at 895.) On mental status examination, Gibson made many requests for repetition of various questions, and she had a blunt and flat affect with a dysthymic mood, but she did not display any clinical signs or indications of ongoing psychotic processes, delusional thinking or hallucinations, and she displayed no evidence of a thought disorder. (R. at 893.) Gibson denied current suicidal or homicidal ideation, plans or intent, and she was not taking any prescription medications for depression at that time. (R. at 894.) After 10 minutes, she was able to recall one of five words presented to her earlier, and she could not perform Serial 7s or 3s. (R. at 894.) She had erratic to poor eye contact. (R. at 894.) Gibson's subjective complaints were rather extreme, rating her depression as a 10 on a 10-point scale and noting frequent crying spells and panic attacks. (R. at 894.) Lanthorn assessed her GAF score at 50, indicating only moderate symptoms. (R. at 896.) However, in an accompanying mental assessment, Lanthorn concluded that Gibson had either a seriously limited or no useful ability in all areas of making occupational, performance and personal/social adjustments. (R. at 899-901.)

Despite Gibson's contention that Kegley's treatment notes support such harsh limitations, I disagree. Kegley's notes from 2010 forward indicate that, for the most part, Gibson was mildly depressed with congruent affect. They further indicate that Gibson suffered from situational depression, including financial and transportation difficulties, inability to obtain disability benefits, physical health

-25-

complaints, relationship stressors, her mother's death in 2005 and the loss of the family business in 2006. Her GAF score ranged from 50 to 65 from 2010 through 2012, indicating only mild to moderate symptoms. Kegley found that Gibson was able to complete all activities of daily living and independent living with no intervention. Although Kegley noted, in July 2012, that there had been a marked reduction in Gibson's psychiatric, adaptive or behavioral functioning or an extreme increase in personal distress, he did not support this finding with any explanation other than to say that Gibson denied any past or current suicidal or homicidal ideations. In September 2012, Kegley again noted that Gibson had age-appropriate activities of daily living skills.

I also find that Lanthorn's harsh restrictions are not supported by the other substantial evidence of record. For instance, in July 2010, Gibson did not report any psychiatric difficulties, and family nurse practitioner Looney noted no abnormalities with orientation, memory, mood and affect or insight and judgment. Likewise, in July 2012, Dr. Blackwell noted that Gibson was alert, cooperative and fully oriented with good mental status. Her affect, thought content and general fund of knowledge appeared intact. In August 2012, during an emergency department visit, Gibson voiced no psychological complaints and denied the presence of any significant mood disorders, anxiety or depression. In October 2012, state agency psychologist Hamilton opined that Gibson was capable of at least simple, unskilled tasks that did not require a great deal of contact with others. She found no restrictions on Gibson's activities of daily living, moderate difficulties maintaining social functioning, no difficulties maintaining concentration, persistence or pace and no repeated episodes of decompensation of extended duration. Hamilton also found that Gibson was moderately limited in her ability to interact with the general public and to get along with co-workers or peers

without distracting them or exhibiting behavioral extremes. When Gibson saw Dr. Bentley in February 2013, she did not complain of any mental impairments, and she was fully oriented with a normal affect and intact insight and judgment. In June 2013, when hospitalized for a seizure, Gibson denied any depression, suicidal or homicidal ideations, anxiety or hallucinations. Her psychiatric state was deemed normal at that time. When Gibson returned to Dr. Bentley in July 2013, she was fully oriented with intact insight and judgment with a normal affect and unimpaired recent memory.

I also find that Lanthorn's opinion is not supported by the psychological evaluation performed by Jones and Whitehead in October 2013, just two days after Lanthorn's evaluation. The examiners noted that they were unclear whether Gibson put forth her best effort on mental status tasks. Although Gibson reported "bad depression," she was not taking any psychotropic medications and could not recall the last time she did. She denied current thoughts of self-harm. Despite Gibson's report of significant memory problems, the examiners noted that she had no difficulty with attention or concentration and responded to inquiry without repetition. Only minor psychomotor retardation was noted, and eye contact was moderate. She denied hallucinations and delusions, and there was no evidence or presentation of any disordered thought processes. Gibson's stream of conversation was appropriate, and she was rational and alert. She could recall two of five items immediately and three of five items after approximately 20 minutes. The examiners noted that Gibson had no difficulty relating to them and should have no difficulty relating to others. They placed her GAF score at 60, indicating only moderate symptoms.

Based on the above reasoning, I find that substantial evidence exists in the record to support the Appeals Council's finding that Gibson was not disabled and not entitled to benefits prior to September 29, 2013, when she became a "person closely approaching advanced age." An appropriate Order and Judgment will be entered.

DATED:     March 17, 2017.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE